### AT A SPECIAL SESSION HOLDEN AT COLUMBUS. DEC., 1824.

---

JOHN ROADS *v.* J. C. SYMMES AND W. STANBERRY.

DAVID BEAVER *v.* SAME DEFENDANTS.

ZIBA LINDLEY *v.* SAME DEFENDANTS.

*Lien—Execution—Equities—Sheriff's Deed.*

Judgment is a lien on debtor's lands.

Lien is co-extensive with the jurisdiction of the court.

Not a lien upon after-acquired land conveyed before levy.

Under the laws of Congress, legal title does not vest until patent issues

Equitable interests in land can not be sold upon execution at law.

The law of 1795 did not require an inquest upon unimproved lands.

A process from a general court can run throughout the state, without the *testatum* clause.

What lands should be first seized in execution is not open for inquiry after sheriff's deed.

Acknowledgment of sheriff's deed is indispensable.

296

The law of 1795 is in force as to sales under judgments rendered before the 14th of January, 1802.

Acknowledgment can not be presumed.

Deeds made in other than Hamilton county are ineffectual.

THESE were several bills in chancery, filed in Licking county, and adjourned for decision at this court.

The complainants severally were in possession of separate parcels of the fourth section, first township, thirteenth range of United States military land, situate in Licking county. This section or quarter township contained four thousand acres. The complainants derived title under a sheriff's sale, and the bills were brought to obtain a disclosure of a claim set up by the defendants and to have the title of the complainants quieted.

The material facts of the case were as follows: On the 8th of February, 1800, the land in question was located and registered in the name of John Cleves Symmes, and patented to him on the 3d of April following.

At March term, 1800, of the general court sitting at Cincinnati, Daniel McLure recovered a judgment against J. C. Symmes for $3,882.16. On the 10th of April of the same year a *fi. fa. et lev. fa.* was sued out on this judgment, directed *to the sheriff of [282 Hamilton county, which process was from time to time renewed, tested alternately at Cincinnati and Marietta, until October, 1802. Upon these processes about four hundred and thirty dollars was made. In October, 1802, a *fi. fa. et lev. fa.* was sued out, and directed to the sheriff of Fairfield county. Upon this writ the following return was made:

"*Nulla bona;* and I have levied on five tracts of land in the military grant, to wit: section 1, township 4, range 16; section 4, township 1, range 13. Also, two thousand six hundred and fifty acres, on the east side of section 4, township 4, range 16. Also, one thousand nine hundred and eighty-four acres, on the west side of section 1, township 3, range 16, Also, two thousand two hundred and seventy-five acres, being part of section 3, township 3, range 14, of which I have sold seven thousand acres, and made two thousand six hundred and eleven dollars. The residue of the land remains unsold for want of bidders."

On the 10th of December, 1803, a *vendi.* issued from the supreme court of Hamilton county founded on the above levy and return,

for the sale of the lands returned unsold. This *vendi.* was directed to the sheriff of Fairfield county, and was returned by the sheriff that he had sold one thousand acres, in section 4, township 1, range 13, to one Stone, who, on tender of the deed, refused to make payment.

On the 25th of August, 1805, an *alias vendi.* issued from the same court, directed to the sheriff of Fairfield county, upon which he returned, "sold the within three thousand two hundred and seventy-five acres of land, as the law directs, on the 30th of September last—one thousand acres to Elnathan Scofield, for two hundred and fifty dollars; two thousand two hundred and seventy five acres to Daniel McLure, for one hundred and five dollars."

The complainant, John Roads, claimed the northeast quarter of section 4, township 1, range 13, sold to Daniel Vanmetre, upon the first sale, for five hundred and seven dollars. The purchase money was paid on the 7th of March, 1803, and a deed executed and delivered on the 8th of April, in the same year. This deed was not acknowledged by the sheriff until May, 1822, when it was acknowledged by Kratzer, the original grantor, in the supreme court of Clermont county. Roads deduced a regular title from Vanmetre.

283]    Daniel Beaver claimed the southeast quarter of the *same section sold upon the first sale, and bid off to Abraham Kinney. On the 20th of June, 1803, Kratzer conveyed to Kinney. The deed is not acknowledged by the sheriff, but is proved by one subscribing witness and recorded.

On the 13th of July, 1803, Kinney made to Kratzer, the sheriff who made the sale, a power of attorney to sell all his lands in Fairfield county. Under this power, Kratzer conveyed the land in question to Daniel McLure, the plaintiff in the action, for five hundred dollars, from whom Beaver deduces title.

Ziba Lindley claims the one thousand acres sold at the second sale to Elnathan Scofield. The conveyance was made by the sheriff to Scofield on the 15th of April, 1806, but was not then acknowledged. This was done by Kratzer, in the supreme court of Clermont county, May, 1822. Scofield conveyed to Lindley, November 7, 1806.

The defendants claim title under John C. Symmes, who, on the 26th of January, 1801, conveyed to the defendant, John C. Symmes, Jr., section 4, township 1, range 13, for the consideration expressed in the deed of $4,000 and took back a mortgage on the

Roads *v.* Symmes, etc.

premises to secure the payment. John C. Symmes entered satis-faction on this mortgage, October 15, 1803.

Testimony was taken in the cause impeaching the integrity of the sale by Kratzer, as sheriff, to Kinney, and also the fairness of the conveyance between Symmes. But as the court deemed it un-necessary to decide upon either allegation, that part of the case is omitted.

It was also in proof that John C. Symmes, the debtor, owned other lands than those levied on at the time the levy was made, the title to which stood in his own name.

STANSBERRY objected to the validity of the title of the complain-ants upon the following grounds:

1. The judgment rendered in Hamilton county, in March, 1800, did not attach as a lien upon the land in question before levy made, because the legal title was afterward acquired by the judgment debtor.

2. No inquest was held upon the land as required by law.

3. No execution could issue from Hamilton to Fairfield county, and if any could issue, it ought to have been a *testatum.*

*4. The return upon the *fi. fa. et lev. fa.* to Fairfield county [284 does not specify the lands sold, and this can not be explained by parol.

5. John C. Symmes had other lands not conveyed, upon which the judgment ought to be executed before lands aliened could be taken.

6. The lands claimed by Lindley, and sold on the *vendi.,* are not described in the writ, which is indispensable.

7. Under the law, a *liberari facias,* and not a *vendi.,* was the proper, and only proper process.

8. The act of 1802 does not affect the case, because the law of 1795 remained in force for enforcing judgments rendered before the act. of 1802.

9. The acknowledgment by the sheriff, in open court, of a deed' for lands sold upon execution, is essential to the validity of such deed, under the act of 1795, and the acknowledgment by Kratzer,. in 1822, can not avail anything.

1. The judgment did not atttach as a lien. It was rendered in' March, 1800. The patent to Symmes is of subsequent date, April,

1800. The deed from Symmes, the debtor, to Symmes the present defendant, is dated January 26, 1801. The execution upon which the land was sold, issued in October, 1802.

It is settled in Pennsylvania, that " a judgment is not a lien upon lands subsequently purchased by defendant, and aliened before execution issued." 5 Binney, 135. In a country like this, where land is an article of trade and barter, this principle is correctly settled. It is settled differently in England, because the reason there is different—land is not a subject of merchandise, but remains permanently in a few hands, secured to the possessors by various limitations and restrictions against alienation, and is in no case, as with us, subject to be sold upon execution, as a chattel.

The land in question was located and registered by Symmes before the judgment, and it may be insisted that the judgment attached as a lien upon the interest he had acquired. In Pennsylvania, it is decided that a judgment is a lien upon every kind of equitable interest in land, vested in the debtor at the time of the judgment. 3 Binney, 4. But a different rule has prevailed in this state. Our legis-285] lation *and adjudications have proceeded upon a different principle. Equities of this kind are frequently secret, except between the parties, and no man could be safe in purchasing lands, if judgments against any who have had an equitable interest attached as a lien upon that interest under any circumstances. . If the lien exist, it ought to be perfect, so as to prevail against a purchaser without notice. If it be imperfect, dependent upon the purchaser having notice, it would serve no useful purpose, but would tend to introduce uncertainty in titles, and extended litigation.

2. The sale of lands is irregular, because the proceedings do not show that any inquest of valuation was held.

The law of 1795 provides that it shall not be lawful for sheriffs to made sale of lands upon execution, where the yearly rents or profits would be sufficient within seven years to pay the debt and costs. And the third section provides, that if the clear profits shall not be found sufficient to pay the debt or damages in seven years, " by inquest of twelve men," the sheriff or other officer shall certify the same upon the return of the execution, whereupon a *vendi.* shall issue to sell such lands.

No such proceedings were had in the case, and upon the princi-

ple decided in the case of Patrick's lessee vs. Oosterout, 1 Ohio, 27, the sale is void.

3. The writ of *fi. fa. et lev. fa.* issued from Hamilton county to the sheriff of Fairfield county, is not a *testatum*, and therefore is void.

There is no authority for issuing an execution to the sheriff of a county other than that in which the judgment is rendered, unless it be a *testatum*. Tidd, 929; 2 Caine, 62; 3 D &. E. 388. The authority to issue execution to a different county is given by a subsequent statute, not in force when any of these processes issued.

4. The return upon the writ of execution does not specify the lands sold—and this can not be explained by parol.

The return sets out a levy upon certain lands specifically described, and adds, " of which I have sold 7,000 acres, and made $ 2,611; the residue of the lands remains unsold for want of bidders."

Roads & Beaver claim 2000 acres under this sale, and to sustain their claims they insist upon introducing parol *proof, that [286 the lands they claim were in fact sold under this writ, and are included in this return. But this, we maintain, can not be permitted. It is laid down in 7 Mass. 388, 392, that "an officer's return must be in writing. The owner has no regular means of knowing whether the officer has done his duty other than by inspection of his return." "Extent by sheriff not made conformable to law void." 9 Mass. 92. "A return by sheriff necessary to validate a sale." 9 Mass. 141.

It may be said that these cases have no application here, because in Massachusetts the sheriff makes no deed for land delivered upon execution. The land is delivered to the creditor at the appraisement of men, and the creditor holds by virtue of the sheriff's return alone. Therefore great strictness is required. These, however, are not cases of returns where lands are delivered to the creditor. They are both cases that relate to personal goods; and in the last, Judge Parker. says, "the first question which arose on the trial of this cause, respected the evidence of the plaintiff's title, he claiming by virtue of a sale under execution, but produced no evidence of such sale, except parol proof of the doings of the officer. This objection was overruled at the trial; but upon consideration the court is of opinion that it ought to have prevailed. The property did not pass to Hammet so as to enable him to maintain tres-

Roads v. Symmes, etc.

pass; *for that a written return by the officer, stating particularly his proceedings,* is necessary to vest in any purchaser under an execution the property in the goods *of the debtor."*

It is certain that at the common law no return was deemed necessary of the proceedings had upon a writ of *fieri facias.* The writ itself need not be returned. In Fulwood's case, 4 Coke, 67, the court goes so far as to decide that no final process need be returned, if it be absolutely final, upon which no further judgment or process is to be had. The courts of New York, and the other states, have adopted this rule without sufficient inquiry into the reason upon which it was originally founded. This, no doubt, was the contempt with which the original founders of the common law regarded every discription of chattel property.

The Supreme Court of the United States, too, seem to have 287] adopted the same opinion. In Wheaton *v.* Sexton, 4 *Wheat. 506, it is decided that a sale of land is good, though made after the return day of the execution. The court say, " whether the marshal makes a correct return, or any return at all, is immaterial."

As land can not be sold at the common law, the correctness of this position must depend upon the provisions of the legislative act that authorizes the sale. The present statute of Ohio requires the court to make a certificate of the correctness of the sale, before the sheriff shall execute a deed. It will hardly be contended that this certificate should be made without a return of the execution whereon to found it. The principle in Fulwood's case would require a return ; for there it is held that in the case of an *elegit,* where an inquisition is to be taken, the writ ought to be returned to the intent that the court may judge of the sufficiency or insufficiency of the inquisition.

The same principle required a return of the execution under the law of 1795. That law required the sheriff to appear in open court to acknowledge the deed ; without such acknowledgment the deed is inoperative. And this is required that, upon the sheriff s appearing in court to acknowledge the deed, the validity of the sale, and the regularity of the proceedings on the execution, may be inquired into and adjudicated upon.

In 2 Sergeant & Rawle, 54, Chief Justice Tilghman says : " The sale of land by the sheriff, and conveyance of title to the purchaser, is founded upon act of assembly, and not upon the common law. The form prescribed by our act of assembly of 1705 must

Roads *v.* Symmes, etc.

therefore be pursued. The sheriff is directed to give the purchaser a deed *duly acknowledged in open court.* The acknowledgment can not be dispensed with, and can be made nowhere but in court. This provision was necessary to *enable the court to exercise their authority over the sale.* Irregularities often take place, which would occasion great inconvenience if not corrected in a summary way. It is often necessary to set the sale aside, and order a new one. Where there is cause of complaint, the party injured makes his application to the court before the deed is acknowledged, and the acknowledgment is then suspended until the matter is decided."

\*Again. The law under which this sale was made, re-. [288 quires an inquest to be held to determine whether the rents are sufficient to pay the debt in seven years. It may be conceded that this inquest is unnecessary where the lands are in woods so as that they can not be productive. But this is a fact which must always be open for investigation when the sheriff comes to acknowledge the deed. And whatever fact excepted the case from the operation of general law ought to be returned on the writ so as to make part of the record. The court should see that there was a return to support the sale before they permitted the sale to be acknowledged.

It is clear upon both authority and principle that a *fi. fa. et lev. fa.* under the law of 1795 was not a final process upon which the sheriff could sell and convey the lands without any subsequent adjudication upon the case. On the contrary the sale could not be perfected without an order or act of the court receiving the acknowledgment of the deed. A return of the writ was indispensable according to the doctrine in Fulwood's case. And for the same reason the decisions in New York do not apply. These lands are sold absolutely, as chattels, upon execution, and the sheriff makes the conveyance without any act of the court.

The return is manifestly deficient. It does not specify whether the 7,000 acres were sold in gross to one person or in separate tracts to different persons; nor is any description given of the 7,000 acres of land sold. The return ought to have been such as to enable each purchaser separately to apply for his deed, and also to enable the court to decide separately upon the propriety of taking the acknowledgment of each deed. The foundation upon which each separate conveyance was made would thus appear.

The land sold ought to have been specifically described in the re-

turn, so that the part remaining unsold could be distinguished and sold upon subsequent process, without investigating any matter previously transacted. No fact essential to make out a connected title to land ought to rest in parol, except in cases of descent. In all other cases it should be not only in writing, but matter of record. A return upon the execution describing the land sold, 289] and the *purchaser is indispensable to connect the title. And this connection can not be supplied by parol.

5. J. C. Symmes had other lands, not conveyed, upon which execution ought to have been levied.

From documents exhibited in the cause, it appears that 12,000 acres of land was held by Symmes in his own name, when the execution was levied upon the lands in question. This land ought to have been seized and sold by the sheriff before the lands aliened to J. C. Symmes, Jr., could be taken.

In the case of Clowes v. Dickinson, 5 Johns. Ch. 240, Chancellor Kent thus lays down the law: " A judgment creditor can not enforce his judgment against the land of a subsequent purchaser, as long as there is land of the debtor remaining sufficient to satisfy the judgment. He can resort to the land sold only for what remains unpaid of his debt, after the other estate of the debtor is exhausted."

This is but a recognition of a principle of the common law long and well established. It is substantially asserted in Sir William Harbart's case, 3 Co. 11 C. And it is there laid down that if there be several purchasers, and one only be extended for the entire debt, he may by *audita querela*, or *scire facias*, as the case may require, defeat the execution and compel the conusee to sue execution on the whole land. See also Cro. Ja. 506 ; 2 Saund. 23 ; 1 Salk. 601 ; 2 Bac. Abr. 696.

6. The *vendi.* contained no description of the land to be sold, and is therefore defective.

The second and third sections of the law of 1795 regulate proceedings subjecting lands to execution for debt, that may yield certain rents and profits. The fourth section provides that " it shall and may be lawful for the sheriff or other officer to seize and take *all other* lands, tenements, and hereditaments in execution, and with or without writ of *venditioni exponas* make public sale thereof." After directing the mode of sale it proceeds : " But in case said lands and hereditaments, so to be exposed, can not be

sold, then the officer shall make return upon the writ, that he exposed such lands and tenements to sale, and the same remained in his hands unsold for want of buyers; which return shall not make the officer liable to answer the debt or damages contained in such writ; but the writ of *liberari facias* shall *forthwith [290 be awarded and directed to the proper officer commanding him to deliver to the party such part of those lands, tenements, and hereditaments, as shall satisfy his debt, damages, and interest, from the time of the judgment given, with costs of suit according to the valuation of twelve men."

If under this section a *vendi.* could issue, instead of a *liberari facias*, it ought to contain the same certainty that would be required in the latter writ; for if the land did not sell, it ought to be delivered to the plaintiff under this writ; or if this could not be done without a *liberari facias*, then the *vendi.*, upon the return of which the *liberari facias* might issue, ought certainly to describe the land. Without this certainty of description, the land could not be delivered, and the cases decided in Massachusetts strictly apply.

7. But we insist that under this section, the *liberari facias* is the only proper writ; that none other could issue.

The statute authorizes a sale to be made with or without a *venditioni*, which means no more than that upon a writ of *levari facias* the officer may sell without returning the levy, and waiting for a *vendi.* to authorize a sale—and further, that if from any cause the *levari facias* should be returned levied without offering to sell, the sale may be effected upon a *vendi.* But if the land be once exposed to sale, then the writ of *liberari facias* shall issue to deliver the lands levied on to the plaintiff in payment of his debt. This is the plain and obvious meaning of the law; and that it is not confined to the case of mortgages is evident from this: the sixth section, directing proceedings upon mortgages, provides, that the mortgaged premises shall be sold and the money paid to the creditor; " but for want of buyers, to be delivered to the mortgagor or creditor, *in manner and form as herein above directed concerning other lands and hereditaments to be sold or delivered upon execution for other debts or damages.*"

The return of the *fi. fa. et lev. fa.* in this case, is: " I have sold seven thousand acres, *the residue remains unsold for want of bidders.*" This is the return that requires the *liberari facias* to issue. After it was once made, the authority to sell the lands, under the stat-

ute, ceased. It could only be delivered to the plaintiff at a valuation. The reasoning of Chief Justice Tilghman, before quoted, 291] applies to the case and is *unanswerable. Upon these grounds, the title of the complainant, Lindley, is essentially defective.

8. The act regulating executions, passed January 19, 1802, provides that a deed made by a sheriff " shall be acknowledged or proved, and recorded, as is or may be required by law, to perfect the conveyance of real estate in other cases." But this can not help the titles of the complainants. The repealing clause of that act only repeals the law of 1795, so far as may relate to judgments entered after the passage of the new act. And it adds: " but for the purpose of satisfying all judgments which have heretofore been entered, the same shall not be and remain in force, and for no other purpose whatever." No mistakes in practice, or mischiefs that may result, can warrant the court in disregarding the plain and positive terms of a statute.

The cases already quoted from the Pennsylvania adjudications are clear and full, that without an acknowledgment the deed is inoperative. Some difference of opinion may be found as to what objection may be taken, and when, against the acknowledgment, but none as to the fact of an acknowledgment being necessary. The cases in 2 Yeates, 458, and preceding, can not be regarded as authority. They were decisions by two judges only, made at *nisi prius*, so long ago as 1799, and have never been followed. The contrary is now the settled doctrine.

The deeds to Roads and Beaver were acknowledged by Krazter, in Clinton county, before the supreme court, May, 1822.

The proposition that a sheriff can acknowledge a deed so as to give it effect after his office has expired, after the return of the writ upon which the sale was made, and without notice to the judgment creditor, whose estate is thus to be defeated, is a very bold one. It is supported by a *dictum* in Adam v. Thomas, 6 Binney, 254. But it is repugnant to justice, and can not be adopted upon a single *dictum*.

But certainly this acknowledgment, if it can be made at all, can only be made in the county where the judgment was rendered, and where the process was returned. There must be some connection between the original proceedings and a subsequent act to be performed in court, and predicated upon them.

*Mr. EWING, for the complainants: [292

The judgment rendered in the general court of the territory, sitting at Cincinnati, was a lien on all the lands of the judgment debtor within the territory.

1. Though at common law, land could not be sold in satisfaction of a judgment, yet the rents and profits thereof, as they accrued, and the beasts *levant and couchant* thereon, were liable to be seized by *levari facias*, and sold in satisfaction of a judgment or recognizance. In case of a debt due to the king, and also where the ancestor had bound himself and his heirs, by bond or recognizance, and the heir held lands by descent from such ancestor, the land itself was liable for the satisfaction of the debt, and in each of those cases the lien took effect from the first day of the term in which the judgment was rendered. 2 Saund. 68, a. n. 1 ; 1 Plow. 441; 3 Coke, 12, a; Cro. Jas. 450 ; 2 Saund. 8, 9, n. 5 ; 1 Roll. 892; 2 Institutes, 395 ; 3 Com. Dig. 307; Bac. Abr., tit. Exec., letter A.

The several statutes *de mercatoribus* and of extent, though they varied the remedy against the lands of the debtor, in nowise altered the lien which judgments previously had upon such lands, but left them as at common law, the lien being still the same in its nature, commencement, and duration, but holding the property subject to the statutory disposal. 13 E. 1 Ch. 18; 2 Bac. Abr. 710 ; 18 E. 1 Ch. 3; 2 Bac. 688.

The law of Pennsylvania of 1705, of which our territorial law of 1795 is a copy, says nothing relative to the lien of judgments, nor had they a statute any more than in England, creating such lien. But the common law formed a part of the municipal code of Pennsylvania, and in giving their statute effect, the principles of the common law were brought in aid of its provisions, hence the lien of judgments upon lands has been uniformly holden the same in Pennsylvania as in England. 1 Dall. 450 ; 2 Dall. 158; 4 Dall. 214, 320, 450 ; 1 Yeates, 184.

The common law, in like manner, formed the basis of the code of the Northwestern territory. It was specially guaranteed by the ordinance of Congress for its government, and as specially adopted by the governor and judges in a statute from the Virginia code, declaring what law *should be in force. Its strength [293 .and efficacy was the same here as in England and Pennsylvania, and its effects on judgments must have been the same. The con-

SUPREME COURT OF OHIO.

clusion, therefore, is safe, that a lien upon lands was created by the rendition of a judgment.

2. But did that lien extend beyond the county in which the judgment was entered?

The court of the king's bench in England is a court of general jurisdiction, not confined in its sittings to any particular county or shire, but is emphatically a court for the kingdom. A judgment in this court binds the lands of the debtor throughout the kingdom from the time of its rendition. The *elegit*, and even the *fi. fa. without a testatum*, run from this court throughout the kingdom, in the counties Palatine, and even in the principality of Wales. Jefferson *v.* Norton, 2 Saund. 6, 28; 3 Rep. 12, a; 7 Rep. 38; 2 Saund. 68, n. 1.

The Supreme Court of Pennsylvania, whose organization we adopted, was modeled in many respects after the court of king's bench in England, and a judgment in that court was uniformly holden to be a lien throughout the state, until the principle was altered by an express statutory provision. Prud. 150; 1 Yeates, 183; 2 Dall. 158; 3 Bin. 7, 8.

The general court of the territory, like the court of king's bench, was not local, nor stationary—they were accompanied by their officers and their rolls, and wheresoever they might be in the territory they were a court. If a judgment were rendered while they sat in Cincinnati, the execution thereon might bear teste in Marietta, and be returnable to Vincennes. Their judgments were of record *in the territory*, not in a county, and we may safely conclude that the lien of their judgments was co-extensive with the territory.

It is said, however, that as the patent issued to John C. Symmes, the judgment debtor, after the rendition of the judgment, and the land was aliened by him to J. C. Symmes, Jr., before it was actually seized in execution, that the lien of the judgment did not attach upon these lands. This position they attempt to support by the decisions in Pennsylvania in the two cases of Rundle and Margatroyd *v.* Etwin, and Calhoun *v.* Snyder, 2 Yeates, 23; 6 Bin. 135.

294] *But from the rules of the common law, and the decisions in Pennsylvania, to which even we resort for a guide in the construction of the act, it will be found that the judgment relied upon in the case at bar, was, from the time of issuing the patent,

Roads *v.* Symmes, etc.

or from the date of the judgment, a lien upon the land in question.

If the general appropriation of the land by the act of Congress, and the registry and location of the particular tract by the holder of the warrant, vested a legal estate in the claimant before the issuing of the patent, and if the patent be merely evidence of the grant already perfected, as the authorities seem strongly to imply, this question is at once put to rest, and the lien, both by the rules of the common law, and by the laws of Pennsylvania, attaches from the time of the rendition of the judgment. But if this do not hold, the lien of the judgment, by the rules of the common law, commenced at the time of issuing the patent. To support this position, it were sufficient to advert to the form of their writ of *elegit* in the books of entries, which is always holden the best evidence of what the law is. It commands the sheriff that he " cause to be delivered to the plaintiff at a reasonable price and extent, all the goods and chattels of the defendant, saving, etc., and also the one-half of all his lands and tenements within your bailiwick, which the said defendant on, etc., on the day on which the judgment was rendered, *or ever after, was seized.*" 2 Wheat. 196; Lil. Ent. 576.

Lord Coke, in speaking of the statute of *elegit*, says, " *liberent et medietatem terræ debitoris ;*" which, by construction of law, is *of all he had at the time of the judgment given or at any time after.* 7 Rep. 38.

In truth, this is a well settled principle of the common law, against which there is not in the English authorities one conflicting decision, nor in any of the United States, except Pennsylvania, and in the case of Calhoun *v.* Snyder it is expressly admitted by all the judges, except one, that the common law and the English authorities conflicted with their decision.

If, then, recourse is had to the principles of the common law, the lien of the judgment must be holden to have commenced from the emanation of the patent.

\*In Pennsylvania there is no court possessing an independent equitable jurisdiction; the powers and the jurisdiction of the two courts are vested in a court of law. Hence interests, both legal and equitable, are under the control of their courts of law, and an equitable estate in lands or goods may be sold on execution—and **[295**

a judgment at law binds every kind of equitable interest in lands, etc., from the time of its rendition.

The courts of the Northwest territory were at this time modeled after the courts in Pennsylvania, and derived their power and jurisdiction from the same law. The same control over equitable property, which was vested in the courts of law in Pennsylvania, would, as it was necessary for the establishment of even a tolerable system of jurisprudence, be vested in the territorial courts on the adoption of the Pennsylvania law. 3 Bin. 4; Johns. Ch. 690.

Then even if it be holden that the grant, the registry, and the location of the warrant, vested no legal estate in J. C. Symmes, yet if this question be settled, either by the principles of the common law, or in conformity with the decisions of the courts in Pennsylvania, in either case it must be holden that the judgment was a lien on the lands before the alienation of J. C. Symmes, Jr.

II. As these lands were unimproved at the time of the levy and sale, an inquest to condemn them was unnecessary. This is the settled doctrine in Pennsylvania, and was so holden by the general court of the territory in the case of Thompson v. Symmes, in which the sheriff was ruled to pay costs for unnecessarily calling an inquest to condemn wild land. 2 Yeates, 154; Pur. Ab. 152, in note.

III. But it is said that a common fi. fa. without a testatum could not legally issue from the county of Hamilton to the county of Fairfield.

There is much confusion in the English authorities on this point, and it is difficult to extract from their various and conflicting decisions what the rule of the common law is respecting it. In many cases the testatum clause has been holden absolutely essential to the validity of the process; but in all it is agreed to be matter of strict law, and amendable at any time, even after suit, or writ of error brought. 3 Johns. 144.

296] *In many of the older authorities, it is holden that when the fi. fa. issues from Middlesex (i. e. from B. R.), the testatum clause is unnecessary. I can not find anything relative to this clause in the old writ of fieri et levari facias, by which the rents and profits of the lands of the debtor were seized. But the writ of elegit, which took place in practice, has always been holden good from king's bench to a foreign county without a testatum.

Roads v. Symmes, etc.

4 Com. Dig. H. 137; Barnes, 196; 1 Lilly Ent. 129; Cro. Jac. 246; Imp. Pr. B. R. 391; 2 Dyer, 162, C.

Much of the apparent difficulty of the question is removed, and the authorities well reconciled, by the distinction mentioned by Sergeant Williams in his note to Underhill v. Devereux: "If an *elegit* be returned '*nihil*' in one county, the plaintiff may have a *testatum writ of elegit* to another county. But it is said that a writ of *elegit* must actually be sued out, and returned '*nihil*' by the sheriff, in order to warrant a *testatum elegit* to another county; for if several writs of *elegit* be awarded on the roll to different counties, and a *testatum elegit* is taken out, grounded on a supposed *elegit* issued to the county where the venue is laid, and returned '*nihil*,' when in truth no such writ was ever sued out and returned, the *testatum elegit* is erroneous: therefore, when there are several writs of *elegit* awarded on the roll, care must be taken that the writs of *elegit* only, and not *testatum* writs, be issued." 2 Saund. 68, a. a. (in note.)

It is not easy to render a substantial reason why the *testatum* clause should be absolutely essential in a *fi. fa.* to another county in any case, but it is clearly not necessary in a writ to be levied upon real property, as the *levari facias* or extent on a judgment in king's bench in England, or in the general court of the territory.

The lien of the judgment in those courts extended throughout the kingdom or territory, so as to bind at once all the real property of the defendant. The land, if the creditor elect to make it so by his writ (either the *fieri et levari facias* or *elegit*), becomes the debtor in law, and it seems but reasonable that an execution might go at once to satisfy the judgment supported by the lien in law, as well as to resort to the fiction of an original to the county in which the venue is laid. The one course is plain and direct, *the other circuitous and based on fiction. Such is the law [297 in England in the case of the *elegit*, and the same reason will apply with equal force to the old writ of *fieri et levari facias*, for the land was equally bound to satisfy this writ with its rents and profits, as it is to satisfy the *elegit* by actual delivery; and I have no doubt that anciently this writ issued from B. R. throughout the kingdom without a *testatum*.

But the Supreme Court of Pennsylvania, under the 24th section of the act of 1722, issue the *testatum* when the process runs to a different county from that in which the judgment was rendered.

The practice anciently adopted under this act is still adhered to, though, perhaps, on a view of all its provisions, it might well have borne a different construction. But if there could be any question on this point, as regards the law of Pennsylvania, every doubt is removed in the Northwestern territory by the different wording of their law of 1795, which was professedly adopted from the law of Pennsylvania. Pur. Ab. 149.

The 27th section of the judiciary act of Pennsylvania, which follows other sections, organizing their several courts, enacts that "when any judgment obtained *in any of the said courts* of this province, and execution returned by the sheriff of the proper county where such judgment was obtained, that the party is not to be found, or hath not goods, etc., and thereupon it is testified that he skulks, etc., it shall and may be lawful for the court who issued such execution to grant, and they are hereby required to grant, an *alias* execution with a *testatum,*" etc.

In the 18th section of the territorial law, it is enacted that "upon any judgment obtained in any of the said *courts of common pleas,*" etc.; the residue of the section is the same as that of Pennsylvania, above cited. The change of the phraseology of the adopted act (which is always supposed to spring from some sufficient motive) was to save the general court of the territory from the incumbrance of that wholly useless provision which could not but embarrass and delay the proceedings, and which had been a subject of dissatisfaction with the bar, under the act of Pennsylvania. The contemporaneous construction of the act by the judges 298] who adopted it shows its intent. Not a single instance *can be found in which a *testatum* issued from the general court. In this case, then, the writ of *fieri et levari facias,* without a *testatum,* was regular. 1 Yeates, 183, 184; 1 Dall. 27.

IV. It is further contended that the return of the writ is insufficient, and for this the sale should be avoided.

1. The general doctrine on this subject is very clearly stated in Fleetwood's case, 4 Rep. 67, where it is said, "That in case of a *liberate* or *habere facias seisinam, a capias ad satisfaciendum, and generally of all other writs of execution, which are the most final process, on which no judgment is to be given,* and no further process had, *a return is unnecessary.*" But in case of an *elegit,* and when an *inquest* is necessary, the writ ought to be returned, that the court may judge of the sufficiency or insufficiency of that inquisi-

312

tion. " But it was agreed *clearly* that when no inquest was to be taken, but only the land to be delivered, or seizin had, or goods sold, etc.; *which are but matters in fact*, these are good, although the writ is not returned." Apply this general doctrine to the act of 1795, and the following consequences are necessarily deducible from it :

1. In all cases when on inquest called the land is not condemned, but delivered over to the creditor on *an extent*, the writ, together with the verdict of the inquest, *must necessarily* be returned, for it is by *this*, and this alone, that the creditor holds the lands of his debtor.

2. And if the lands on which the *fi. fa.* is levied be *improved lands and held in fee*, so that an inquest *is necessary*, the writ and the verdict of the jury who condemned the lands must be returned, *to enable the plaintiff to sue out his venditioni exponas*, because in that case the *fi. fa.* is not the *most. final* process.

3. But if the land levied on be wild and unimproved, or if it be an estate of uncertain duration, the *inquest is unnecessary.* The *fieri facias* is the *most final process*, and no judgment is to be given thereon. Hence the sale would be valid *without a return*, for the acknowledgment of the sheriff's deed involves no *judgment* of the court; it is a matter of course, unless objected to, and no more a *judgment* than is an acknowledgment before a justice of the peace. The court, it is true, exercise a legal discretion in accepting or refusing such acknowledgment; but the return is not of course exhibited, nor is it the necessary basis of *the determina- **[299** tion of the court to accept or refuse the acknowledgment. The acknowledgment is never denied, unless the process of the court has been abused, or fraud or unfair practices taken place in the sale. Objections of this kind are substantiated, not by the return, but by evidence. 2 Yeates, 164; Pur. 152 (in note).

It would be idle to urge this objection to the acknowledgment of a deed when it is offered on the return day of the writ. The sheriff could amend *instanter*, and the objection is removed; here it is supplied by that which is at least equivalent to such amendment, the oath of the sheriff and other witnesses present at the sale, and it is competent so to supply it.

For the return of a sheriff has not the sanctity of a record, save when in his judicial capacity he returns an inquest; in all other cases the return may be made or amended after he goes out of

office. It may be disproved or explained, and when wholly want-ing it may be supplied by evidence. 4 Bac. 160; Dalt. Sh. 19; 2 Ld. Raym. 1072; 3 S. & R. 314, 317; 4 Wheat. 504.

2. But this argument concludes more than is necessary to sup-port our case, for the writ was duly returned, and the return in-dorsed thereon is full and sufficient.

It is said by C. J. Kent, in the case of Simonds *v.* Catlin, that, "It is not requisite to the validity of proceedings on execution, that the writ should ever be returned, *nor is it requisite, even if a return be made, that the sheriff should specify with certainty the particular lands sold, or the name of the purchaser ;* it would be sufficient to state, that *of the lands and tenements of the defendant, he had caused to be made the debt and damages specified in the writ, as he was thereby commanded.*" 3 Caine, 63.

But it is said that in New York lands are sold as chattels; so are they in Pennsylvania after condemnation by the inquest, and precisely so in all cases where such condemnation is unnecessary.

But in Massachusetts the writ must be returned, and the return must be specific in its description of the property. True—because the lands are delivered over to the creditors, and he holds by *the return*, and *not by deed.*

300] *The return must, therefore, contain all the requisites of a deed.

By the law of Massachusetts regulating executions, passed in 1783, it is enacted that where the judgment creditor can find no personal estate to his acceptance, wherewith to satisfy his execution, and shall think proper to levy the same on lands, the officer, after appraisement made, etc., shall set out the same by metes and bounds, and deliver seizin thereof to the creditor, etc., and such execution being returned, with the doings thereon, to the clerk's office, and recorded in the office for the registry of deeds in the county in which the land lies, shall make as good a title, etc. Under this statute, as under the statute of extent in England, the return must be special, as the creditor holds by the return; but the authority has no general application. 1 Laws of Mass.

V. It is in the next place objected, that at the time of the levy, J. C. Symmes had other lands which he had not aliened, and that all those lands should have been exhausted before these lands could be sold.

The only cases to be found in the book, in which this doctrine

is laid down and supported, is that of Sir William Harbert, 3 Rep. 11, 6, and Clowes *v.* Dickison, 5 Johns. Ch. 239.

In Harbert's case it is said that the judgment creditor can be compelled, by *scire facias* or *audita querela*, to levy on the land still owned by the judgment debtor; and in Clowes *v.* Dickison, that on proper application in chancery he would be enjoined, etc. There is, however, no case either in law or equity (that I have ever seen), in which either of the courts have exercised that controlling power over the final process of a court of law; and it does seem to me, that if the authority should be ever exercised, it must be on application in chancery, and not at law. Admitting the general position, that the purchaser has a right to direct the execution of the judgment creditor on other lands of the debtor, yet many circumstances may supervene to destroy that right, and give to other third persons a permanent equity against it. Suppose this case, and it is one of ordinary occurrence : A. recovers judgment against B., who is seized of two parcels of land, one of which is sufficient to satisfy the judgment—*B., by volun- [301 tary conveyance, aliens part of the land, and afterward C. recovers judgment against him—A. levies his execution on the part of the land aliened, and the alienee seeks to turn him on the other part of the lands of B. This case, when so many independent interests are involved, could not be settled equitably on motion. And on *scire facias* or *audita querela*, sued out by the alienee against A., in what manner could C. come in and enforce his equity; for an equity he certainly has, paramount to that of the alienee. And in the case supposed, had the elder judgment creditor voluntarily resorted to the land not aliened, equity would interfere in behalf of the younger judgment creditor, and compel the elder judgment to take first the land on which he had the sole lien, or to assign his claim to the younger judgment creditor.

It is said by Chancellor Kent, in the case of Cheesboro *v.* Millard, 1 Johns. Ch. 412, that, "If a creditor has a lien on two different parcels of land, and another creditor has a lien of a younger date on one of those parcels only, and the prior creditor elects to take his whole demand out of the land on which the junior creditor has a lien, the latter will be entitled either to have the prior creditor thrown on the other fund, or to have the prior lien assigned to him, and to receive all the aid it can afford him. This is a rule founded on natural justice, and I believe recognized in

every country having a cultivated system of jurisprudence." The doctrine, which runs through all the books of equity, and the numerous cases which come within its principle, show uniformly the impropriety of exercising the jurisdiction here claimed on the hearing of a motion between third persons in a court of law.

The doctrine laid down by Lord Coke, in Sir W. Harbert's case, has never been sanctioned by any *judicial decision*, and however correct it may be in theory, can not be carried into effect, except by a court of equity; and at least, as respects the mode of enforcing the remedy, is not the law of the land at this day. Indeed ·it is a power which courts of law could not exercise without doing in many instances the most flagrant injustice. In Dickey's case, reported in 1 Hall's Journal of Jurisprudence, 69, it was said by Judge Smith, "Suppose there is a general judgment affecting 302] different *estates, or distinct tracts of land belonging to the defendant, the judgment creditor may select his object and direct a levy to be made of any one of them only, and although the estate levied on may have been sold or conveyed by the defendant subsequent to the judgment, and the remaining lands may be sufficient to satisfy all the liens, yet the court can not interfere. We have not the powers of a court of chancery in such cases, which is perhaps to be lamented. We can not marshal, or apportion the assets. The party, therefore, must look to his indemnity, or covenants of warrantee, or where several are equally liable, and the whole is levied from one, he must sue for contribution—we can not help him by our summary powers." If this doctrine be correct, the defendants in the present case could not have objected this to the sale on motion, timely made in the court of law, nor could they have urged it against the acknowledgment of the sheriff's deed. But if I should be incorrect in this, and if the purchaser could at law control the judgment creditor, and direct his execution, he must do so on principles purely equitable.

When third persons become the purchasers at sheriff's sale, the equity is clear against such an objection. *They* have no reason to inquire into the situation of the judgment debtor, either as to his lands or goods. If he had title to the land levied on, and offered for sale, at the time of the rendition of the judgment, it is sufficient. No one would be safe in purchasing at sheriff's sale if these *latent* equities, unknown and unexpected, could, after the payment

of the purchase money, spring up and be enforced against the purchaser.

But it is said that the objection can be taken any time before the acknowledgment of the deed, and until the deed is acknowledged, the purchaser should not pay the purchase money. This was not the doctrine holden at that day, and indeed if it had been so, it would have rendered all sales at a distance from places where the court was holden impracticable. The sheriff could not return his writ until the money was paid. The deed could not be acknowledged until the purchase money was shown to have been paid either by the return of the writ, or otherwise. The consequence would be that no sale could be closed unless the *sheriff [303 and the purchaser should make a pilgrimage together to the next general court, whether distant one hundred or five hundred miles, there to settle the transaction. This would be too serious an incumbrance on sheriff's sales, considering the small value of land in the territory at that time. This is not the course that was pursued in *those days*, and it would be unwise now to establish a new rule of practice for time so long gone by, when the situation of the country is since so materially changed.

The doctrine in Pennsylvania supports our position to the full extent, and gives the *bona fide* purchaser at sheriff's sale, on application to acknowledge his deed, all the privileges which, by the common law, and by the decisions of the courts in other states, are given to one who holds by *sheriff's deed fully executed.* Judge Smith, in Dickey's case, above cited, speaking of the general doctrine on the subject of sheriff's sales, says : " At common law, after a sale by the sheriff, if the judgment be reversed by a writ of error, the plaintiff shall not have restitution of the goods, but the value of them for which they were sold. If the law were not so, there would be no buyers, and of consequence, no execution done, and the sheriff sells by authority of law, but the sale must be without fraud. So the regularity of the sale can not be questioned against a purchaser under a sheriff's sale in New York. And in the case before Lord Woodwicke, when one was in custody on a *ca. sa.*, and yet the sheriff seized a leasehold estate for ninety-nine years, and sold it after the return day of the writ had expired and without a *vendi*, the sale was held good, though the whole proceedings were irregular; for the writ not being void, the sheriff had an authority under it to convey a title; otherwise it would be very hard if it should be

at the peril of a purchaser under a *fi. fa.* whether it should be regular or not." He further proceeds to distinguish the case of a sale on execution from a sale under the order of a court of chancery, and adds: "In case of sales on execution the lowest is never called upon to approve or confirm. The sheriff sells by authority of his execution, issued of right at common law, and not depending upon any discretionary power of the court. *"Where he sells he may receive the purchase money and make a deed to the purchaser,* 304] *in whom an interest is vested independent\* of the approbation of the court.* All that is required is that the sheriff shall acknowledge his deed, and then when he comes in to acknowledge it, complaints may be made of *fraud* and *unfair practices of sale.*" 5 Rep. 90 ; Cro. Eliz. 278; Cro. Jac. 246; 8 Johns. 361.

In the case of Welch v. Murray, 4 Yeates, 196, an objection was taken to a *vendi.* on which lands had been sold and the judgment creditor became the purchaser. The *vendi.* was returned to the September term, 1804, and at the December term in the same year, and *before the sheriff's deed was acknowledged* a motion was made to set aside the *vendi.* for some alleged irregularity; the court held the writ irregular, but *the delay in the application,* among other reasons, forbid them to set it aside. In Cochran et al. v. Cummins, there had been a delay of two years, and the court, on this ground alone, refused to inquire into the irregularity of the proceedings. 4 Yeates, 136.

So in the case of Clowes v. Dickinson, though Chancellor Kent held the proceedings manifestly irregular and inequitable, yet he refused relief because there had been a delay of four years, and a contract of sale of a part of the premises to an innocent purchaser. 5 Johns. Ch. 244.

In numerous other cases similar adjudications have been made. 11 Johns. 516; 16 Johns. 573; 13 Johns. 557; 2 Tidd, 271.

In the cases at bar there have been fair and regular sales. The purchase money paid, deeds executed, a lapse of twenty years, accompanied with possession in the purchasors. Large and valuable improvements, and repeated transfers of the premises, before this *equitable* objection is brought forward to set aside the sale.

VI. With respect to the tract claimed by Lindley, two other objections are urged as arising on the process : 1. That the lands are not described in the *venditioni exponas;* and 2. That the *alias*

*vrndi.* was irregular, and instead thereof a *liberari facias* should have issued.

1. There is no rule or principle of law which requires that the property to be sold should be particularly described in the *venditioni exponas,* nor can I perceive any valuable object which is to be obtained by so describing it. The writ is directed to the sheriff, commanding him to sell the lands on which he has levied. He does not stand in need *of information as to the lands [305 on which he has levied, and the sale itself rests for its validity on the original *fieri et levari facias,* and not on the *vendi.* According to the most approved precedents neither the *venditioni exponas, nor distringas nuper vice comitem,* describes the goods and chattels which they command to be set to sale. Indeed, it were wholly unnecessary. 2 Saund. 47, L. & M., note 2.

They command the sale of all the goods, etc., seized in the hands of the officer. And both writs are intended to hasten the officer, who has seized the property, and has it in his possession or power to set it to sale. The *vendi.* in question is substantially pursuant to the precedent in 2 Saund. 47, M., in note. It seems to me entirely unexceptionable.

2. That clause of the statute which requires the *liberari facias* to issue in case the land will not sell upon a *vendi.* relates solely to mortgaged premises, and has never been construed, either in Pennsylvania or in the territory, to apply to any other lands. This will satisfactorily appear on a full examination of the statute and by reference to the many cases in which sales have been made, on the *alias* and *pluries venditioni.* Indeed in the case at bar it had not yet been proved that the land would not sell on the *vendi.,* for it seems by the return that it was twice struck off to bidders, who, on tender of the deed, refused to pay the purchase money. There must at least be one opportunity for the land to sell without the interference of puffers (who may be employed by a defendant to defeat a sale) before the plaintiff should be compelled to take the land at its appraised value on the *liberari facias.* Here, it seems, there was none until the last offer, when the land was sold to the purchaser under whom Lindley claims.

IX. The deeds from the sheriff to Scofield and Vanmetre, under which Roads and Lindley claim, were acknowledged in the Supreme Court, sitting in Clermont county, at the May term, 1822, by Samuel Kratzer, the sheriff who executed the deeds. This was

in strict accordance with the requisitions of law, as our Supreme Court is made the legal successor of the general court of the territory. The former observation touching the jurisdiction and character of the general court show that their judgments were **306]** not *of any place, and consequently it is not essential that the acknowledgment should be had in the county in which the court was sitting when such judgment was rendered. It will be seen by inspecting the record that the writs of execution were made returnable to a different county, so that if the acknowledgment had taken place on the return day of the writ, it might not have been at Hamilton county.

If the acknowledgment be in the same court it is sufficient. The deed for the south half to Abraham Kinney has no acknowledgment indorsed, but we claim it may be used in evidence in support of our title, on the following grounds:

1. At the time of the execution of this deed an acknowledgment in open court was unnecessary. The act of 1795 speaks of the acknowledgment of sheriff's deeds in open court; but the act of 1802, which took effect previously to this sale, repealed the former act, leaving it in force only for the purpose of satisfying such judgments as had been obtained under its provisions, and "*for no other purpose whatever.*" 7 T. L. 35, sec. 23.

Each of those acts, it would seem to me, has two distinct objects or purposes, for which it provides: 1. The satisfaction of the judgment. 2. The securing the purchaser in the possession of his property. The first is between the creditor, the debtor, and the sheriff; the second between the sheriff and his purchaser. The rights of the creditor and debtor become fixed and vested under the form which may be given them by the law in force at the time of the rendition of the judgment; and though the legislature might, perhaps, have power to change them, yet such would not be a proper subject of legislation. But the rights of the purchaser do not vest until the sale, and the legislature may, at any time previously thereto, vary or modify the form of security which he is to receive for his purchase. It would then have been correct for the legislature to change the law, as far as it respects the acknowledgment of the deed, but incorrect so far as touches the rights of the creditor in the satisfaction of the judgment.

The phraseology of the law, "*for no other purpose whatsoever,*" is that of strict limitation, intended to confine the previous term

(*satisfying such judgment*) in its most narrow *and limited **[307** sense. These words of the act strongly favor our construction, but the reason and object of the law much more.

The territory over which the general court had jurisdiction was extensive. Vincennes, Detroit, Warren, and Steubenville were among the county seats in the more populous counties. It was unreasonably burdensome to require of the sheriff who had sold lands in Vincennes or Detroit, on a judgment in the general court, to attend and acknowledge the deed in Cincinnati or Marietta, to which place the writ must probably be returned. This evil was remedied by the law of 1802, if we give it the construction which the words in their restrictive sense seem to require; while at the same time no vested right is assailed or abridged. But if such acknowledgment were essential to the validity of the deed, the presumption of law arises, from length of time, that it was so acknowledged.

The acknowledgment need not appear upon the deed itself, but may be a matter of record in the court in which it was taken; the fact, then, that a copy of the deed without an acknowledgment is produced, does not militate against such presumption. A matter of record may be presumed. In the case of the Mayor of Kingston, upon Hull *v.* Homer, it is said, " That if a foundation can be laid that a *record* or deed existed, and was afterward lost, it may be supplied by the next best evidence to be had, *or if it can not be shown that it ever existed,* yet enjoyment under a title, which can only be by *record,* is strong evidence to be left to the jury that it *did once exist.* In Turner *v.* Sadler, a grant which must be of record was presumed, and in Hesselden *v.* Broadney, a recovery which is a conveyance of record was presumed. 6 Bin. 255; Cow. 108, 109; 1 Ray. 26; 2 H. & M. 370; Phil. Ev. 124; Term. 159.

But it may be said, that such acknowledgment *is not probable,* and therefore can not be presumed.

In the case of Eldridge *v.* Knott, the court of B. R. referring to the case of the Mayor of Kingston, upon Hull *v.* Homer, says, "it is not in such case that the court *really thinks* a grant has been made, because *it is not probable* that a grant should have existed without its being upon record, *but they presume the fact, for the purpose, and from the principle *of quieting possessions."* So also **[308** says the master of the rolls, in the case of Helleeny *v.* Walker, "Presumptions do not always proceed on a belief that the thing

presumed has actually taken place, *but merely for the purpose, and on the principle of quieting possessions.*" And Lord Erskine, Chancellor, in the same case, says, " It is said you can not presume unless you believe. It is because there are no means of creating belief, or disbelief, that such general presumptions are raised, on subjects, of which there is no record or written muniment; therefore, upon the weakness and infirmity of all human tribunals, judging of matters of antiquity, instead of belief (which must be the foundation of judgment upon a recent transaction), when the *circumstances are incapable of furnishing anything like belief*, the legal presumption holds the place of particular and individual belief." Cow. 214 ; 12 Ves. Jr. 222, 266.

This doctrine is reiterated and fully sanctioned by the Supreme Court of the United States, in the case of Provost *v.* Gratz. Indeed, it is the settled and undisputed law of the land at this day ; and time has elapsed since the sale, sufficient to raise the legal presumption in its favor. It is said, in the case of Richard *v.* Williams, that, " in general, it is the policy of courts of law to limit the presumption of grants to periods, analogous to the statute of limitations, in cases where the statute does not apply. But where the statute applies, it constitutes ordinarily a sufficient title, or defense, independently of any presumption of a grant, and therefore it is not generally resorted to. But if the circumstances of the case justify it, the presumption of a grant may as well be made in the one case as in the other, and when the other circumstances are very cogent and full, there is no absolute bar against the presumption of a grant within a period short of the statute of limitations." In the case at bar, twenty years, the period to which all real actions are limited by the act of January, 1804, had elapsed after the sale, and previously to filing the bill, and here, as the statute of limitations, for various reasons, can not apply, the case falls properly within the principle of legal presumption. 6 Wheat. 504 ; 7 Wheat. 110.

The obvious policy, which gives rise to statutes of limitations 309] and legal presumptions, is modified and varied by *the particular situation of the country where it is applied. In England, the great mass of the population has for ages past been fixed and stationary, and the records of their courts preserved in safety.

Within the bounds of the Northwest territory; the population has been fluctuating, the hardships and diseases incident to the coun-

try, together with the spirit of emigration, in a few years, sweep from each place all its early inhabitants; and the earlier records of our territorial courts have been almost lost. So far, then, as relates to the proof of an ancient transaction, by living witnesses or the records of the country, the lapse of time operates less powerfully in England than here. But the contrast is still more striking when viewed with respect to situation and the feelings of the occupant. There, if at the end of a long series of years, he be evicted from his possession by an adverse claim, he is merely deprived of that which he has long enjoyed. He has not been injured by the length of his possession, for in England real property is a constant source of revenue and power. But here it is a burden until the labor of the occupant renders it valuable; and if after this it is wrested from him, it is not the property alone which has been lost, but the strength and sinews of the man, which were wasted to render that property susceptible of enjoyment. Hence our legislature early adopted a period of limitation as respects real actions, much shorter than is established in England; and the same reason applies with equal force to those legal presumptions which arise independent of the statute.

3. But again—this deed, even under the law of 1795, may be read in evidence without an acknowledgment. In Morehead v. Pearson, 2 Yeates, 458, a case in which this point arose and was expressly decided by the court, it is said, "That the usage of acknowledging sheriff's deeds of lands in the term succeeding the sales, is certainly attended with many conveniences, and ought to be followed. It gives the debtor and creditor an opportunity of making their complaints on a day certain, which are soon heard and determined, and much time and expense are saved thereby. The words of the act, however, are only directory, and do not invalidate a sheriff's deed for want of an acknowledgment in court. Such acknowledgment does not appear to *be essentially [310 necessary in all given cases. Suppose the sheriff to execute the deed and receive the money on one day, and die or become incapable of acknowledging it afterward, it would be hard to say that the deed was defective on that account, and that a new sale must be had. On the whole, we think the present deed may be supported *without the usual acknowledgment*, after so great a lapse of time [23 years], and no objection made to it by the debtor, but in its operation it is subject to every exception which may be had against a

sheriff's deed on its acknowledgment being tendered in open court." If the reasoning of the court in the above cited case be correct, and there be any cases in which the acknowledgment in open court can be dispensed with, it must apply to cases like the present, of sales in counties far remote from the place where the court is holden, in which cases an acknowledgment becomes in a great measure impracticable, and frequently impossible.

Hence in cases like this, arising in the remote counties in the territory, no acknowledgment in open court has ever been had.

This authority is not only supported by reason, but (in the extended territory) by the convenience, and even by the *necessity* of practice; it is supported, also, by an unvarying custom during the existence of the act of 1795.

If it be sanctioned by the court, we have a legal and available title to all the lands in question, which can be met and defeated by that kind of evidence alone, which would defeat an application for the acknowledgment of a sheriff's deed. That this can be defeated only by fraud, or an abuse of the process of the court, has been already shown by the authorities above cited.

We stand in every respect fully and fairly upon the ground of purchasers at sheriff's sale, claiming under a sheriff's deed, on which no judgment of a court has been passed.

It has been the policy of courts from the earliest ages of our judicial history, to sustain and support those titles which are acquired under their process. It is said by Lord Coke, 8 Rep. 97, speaking of a sale of a term of years, " If the sale of the term should be avoided, the vendee would lose his term and money too, and there-
**311]** upon great inconvenience *would follow; that none would buy of the sheriff goods and chattels in such cases, and so execution of judgments (which is the life of the law) would not be done. 8 Rep. 97; 1 Yelv. 179.

In a case in chancery, (1 Ves. Sen. 195), where one was in custody on a *ca. sa.* a *fi. fa.* was issued against the same person on the same judgment, and the sheriff seized a leasehold estate for ninety-nine years, and sold it after the return of the writ had expired, and without a *vendi.* The sale was holden good, though the whole proceedings were *irregular;* for, says Lord Hardwicke, " The writ not being *void*, the sheriff had an authority under it to convey a title, otherwise it would be very hard if it should be at the peril of a purchaser under a *fi. fa.* whether the proceedings were regular

·or not." In 2 Schoales & Lefroy, 566, and other cases there cited, the same doctrine is held in relation to sales under the order of a court of equity. 9 Ves. 37.

In Jackson *v.* Bartlett, 8 Johns. 366, it is said, on the trial of an ejectment, the question of the regularity of a *fi. fa.* under which the land was sold, could not be raised. "It is not (say the court) for the present defendant to question a purchaser's title under such execution; it was a good authority for the sale." 16 Johns. 575; 11 Johns. 516.

So in the case of Young *v.* Taylor, 2 Bin. 227, Yeates J., in delivering the opinion of the court, says, "For it has often been decided, on the trial of an ejectment, instituted by the sheriff's vendee, the court will not inquire into the formality of the proceedings on which the sale was founded, it amounting, in fact, to an attempt to reverse the *process* of one court in one cause, by another court collaterally in another cause."

So also in the case of Little and others *v.* De Lancey, 5 Bin. 273, it is said, "Admitting that irregularities appear on the face of the ·different executions, and such is certainly the case, they are not void if founded on a judgment, but only voidable. The vendee, under a sheriff's sale, is protected by the common law, upon strong grounds of substantial policy, when he is no party to the proceedings."

In 3 Bibb, 216, it is holden that if the sheriff sell, without *advertising*, the sale will *be good*, and the party injured will have his redress against the sheriff.

*And in Wheaton *v.* Lintons, 4 Wheat. 507, Justice Johnson, [312 in delivering the opinion of the court, sums up the doctrine in these words: "The purchaser (at sheriff's sale) depends on the judgment, the levy, and the deed; all other questions are between the parties to the judgment and the marshal. Whether the marshal sells before or after the return, whether he makes a correct return, or any return at all to the writ, is immaterial to the purchaser, provided the writ was duly issued, and the levy made before the return."

But again—the whole proceedings have been in strict accordance with the general practice of the courts at that time, and few, or none of the sales, made under the act of 1795, could be supported if this is held invalid.

It is holden, in 5 Cranch, 22, that "the practice under a law will

be respected, even though on a strict construction, it might be considered erroneous—for otherwise, much mischief might ensue, and many titles be unsettled." And if there is any case, where the maxim *"communis error facit jus"* can have a proper and legitimate application, it is in cases like the present, where the error (if any there be) has been committed by officers, constituted by the courts, and acting under their supervision and control. 1 Ser. & R. 102 ; 2 Bay. 441.

On the whole, it seems to me that no sufficient objection has been shown to shake the title of these complainants, after twenty-one years' acquiesence, and about twenty years' peaceable possession— more especially, as the decision in the present case, will involve the fate of many thousands of real property within the bounds of the territory.

By the COURT:

It has been settled that the judgment of a court of record operates as a lien upon the real estate of the defendant. Whether this is a maxim of the common law, or was first introduced by the statute of Westminster, 2, is of no importance in this case. The law of 1795, declaring what laws shall be in force, adopts both the common law, and all statutes of the British Parliament, made in aid of it, prior to the fourth year of James the first. In either case, this law established the principle amongst us, and it has been acted upon from the commencement of the administration of justice in the territory.

**313]** *It is equally well settled that this lien is co-extensive with the territorial jurisdiction of the court that renders the judgment The general court of the territory exercised jurisdiction, and sent its process, original and final, into any county within the territory. The judgments rendered by it were of consequence a lien or charge upon all the lands owned by the defendant, and situate anywhere in the territory. This, it is understood, is not controverted.

The legal title to the lands in dispute was not vested in the defendant when the judgment was rendered, and before the levy was made, he conveyed them to one of the present defendants, under whom the other claims. Under these circumstances, it is maintained the judgment, upon which the execution issued, never attached as a lien upon these lands. And this is the opinion of the court.

The complainants' counsel assert that the doctrine is settled differently in England, and in some of the States of the American confederacy, and have adduced authorities in support of this position. But these are all rather inferences than direct adjudications.

In the case of Calhoun v. Snyder, 6 Binney, 145, the point is very fully and ably examined by two of the judges. The force of the authorities, cited in support of the opposite doctrine, is much weakened by this exposition. And the decision of the court, in that case, is placed upon such clear and satisfactory grounds, that we feel no hesitation in adopting it. The judgment, in the case of McLure v. Symmes, rendered at March term, 1800, did not attach as a lien upon the lands in dispute, the legal title to which was obtained by the debtor in April following, and conveyed in January, 1801, before execution levied.

The lands in controversy were located by the debtor in February, 1800, and though not patented until April, the counsel for the complainants contend that the act of Congress, under which the title is derived, invested the locator with the legal title before the emanation of a patent.

It was certainly competent for Congress to declare what should be done to invest those deriving title to lands under the laws of the United States with the complete legal title to such lands They provided that this shall be done by granting a patent to those entitled. Whatever *right a party may have previ- [314 ously acquired, he is not invested with the complete perfect title until this patent is issued. The patent is not the foundation, but the consummation of the title. Until it emanates, the legal power of the government over the subject is not at an end. Upon its emanation that power terminates, and the right of the grantee is perfected. Symmes, therefore, held no legal estate, which could be bound by a judgment, until the patent issued.

It is further insisted that whatever interest, legal or equitable, Symmes held in these lands, under the registry and location made in February, 1800, that interest was bound by the judgment in question. And this is said to be conformable to the decisions in Pennsylvania, where the principles of jurisprudence are the same that prevailed under the territorial government in 1800. The liability of equitable interests in land, to be seized and sold upon execution as land, has never been recognized by this court, as existing either under the territorial or state governments. That

it can not now be so seized and sold, is settled both by judicial determination and legislative enactment. If these equitable interests ever could have been taken in execution at law, they must have been seized in the character in which they existed, not in a different character. This was not, and could not be done in the case before the court. The e⸱ʌuity, whatever it might be considered, merged in the legal title before the levy made. And, as the judgment could not attach as a lien upon the after-acquired legal title, it could not operate upon an equity extinguished by, and merged in that title. There is no principle, upon which it can be held, that a judgment may bind an interest which can not be seized and sold to satisfy it.

There is no force in the objection that an inquest was not held upon the land before the sale on execution.

The second and third sections of the law of 1795, subjecting real estate to execution for debt, provide for the case of land yielding rents or profits. The *fourth* section embraces the case of "*all other lands*," that is, lands *other* than those which yield rents and profits. It requires no inquest, but directs a sale "*with all convenient speed.*" If lands, only liable to be sold as directed by the **315]** second and third *sections, should be sold under the fourth, it would be good reason for setting the sale aside, upon proof of the fact. But as the law authorizes a sale, without inquisition, the court must presume the sale rightfully made, until proof is adduced that it is not.

It is no objection to the process that it was not a *testatum.* The county of Fairfield was as fully within the jurisdiction of the court, with respect to process, as the county of Hamilton. The *testatum* is only required where a court issues process to a county in which it has no general jurisdiction.

With respect to the fact that the debtor owned lands not aliened, at the time of the execution, it can not be given in evidence to defeat a sale upon execution. When the sheriff's sale is completed, by payment of the money and delivery of the deed, the title of the purchaser ought not to be affected by a circumstance of this character. To permit this, might introduce great mischiefs, and would render purchases under execution too insecure. Upon return of the execution, is the proper time to settle all questions of this kind. If a sale were pressed on before the return of the execution, so as to deprive a purchaser of an opportunity then to be

heard, he might obtain an injunction to stay it for that purpose.

The objections that the return upon the *fi. fa. et lev. fa.* is insufficient that a *liberari facias*, and not a *vendi.*, ought to have issued, and that the *vendi.* does not sufficiently describe the lands to be sold, have not been consided and decided by the court, because it is not necessary now to decide them, and they may possibly be hereafter presented for consideration in some other form. There is one objection, which the court consider fatal to the complainants' claim, as now presented. None of the deeds have been acknowledged in the manner prescribed by law, and without such acknowledgment they convey no title.

The fourth section of the act of 1795, after directing the manner of sale upon execution, proceeds, "and upon such sale, the sheriff or other officer shall make return thereof, indorsed or annexed to the said *levari facias*, and give the buyer a deed duly executed and acknowledged in court for what is sold."

*It is obvious that the provision requiring the acknowl- [316 edgment to be made in court was not meant as a mere idle ceremony, nor could it be intended as evidence of the execution of the writ, which must be returned with the sale indorsed or annexed. The requisition is plainly made for the just and useful purpose of giving the defendant an opportunity to object to the regularity or fairness of the sale. As to these matters, without this provision, he could have no day in court, and might claim to make his objections to the sale in a subsequent suit with the purchaser, which would not only be inconvenient, but might operate great injustice. This acknowledging the deed in court, conduced to the security of all parties, and is a substantial part of the transaction, which can not be dispensed with.

The case from 1 Sergeant & Rawle, 54, is full in point, as to what is the doctrine in Pennsylvania. It is of higher authority than the *nisi prius* cited from Judge Yeates' reports, not only because it is a much later decision, but because it was made by a full court, upon mature deliberation.

These deeds are not aided by the statute of 1802, regulating executions; that act, in terms, extends only to judgments rendered after its passage. For the purpose of satisfying judgments then rendered, it left the law of 1795 in full force. One of the means of satisfying these judgments was by the sale upon execution of

the debtor's lands. This sale could only be conducted and perfected under the provisions of the law of 1795. These require the sheriff to acknowledge the deed in open court; if this is not done, the deed is inoperative.

After the time that has elapsed, the counsel for the complainants suggest that the acknowledgment of the deeds ought to be presumed. His argument on this point, though ingenious, is not satisfactory. The deeds are produced, and the acknowledgment, which constitutes an essential part of their execution, does not accompany them. A grant may sometimes be presumed; but if it be produced, and is defective, nothing can be presumed to aid that defect. The circumstances of the case rebut the presumption contended for. One of the deeds is proved by a subscribing witness, the other two have been recently acknowledged by the **317]** *grantor. These facts show the clear understanding of the parties, that the acknowledgment required by law was never made.

The two deeds acknowledged in the supreme court of Clinton county derive no additional validity from that act.

The first legislature held under the state government abolished the general court. The twenty-sixth section of the act of April 15, 1803, transferred to the Supreme Court "cognizance of all judgments, causes, and matters whatsoever, whether civil or criminal, that were then pending, undetermined or *unsatisfied* in the general court." It also provided that all writs issued out of the general court should be continued over, of course, to the first session of the supreme court to be holden in the respective counties.

Under this law, the writ of *fi. fa. et lev. fa.*, then in the hands of the sheriff of Fairfield county, was returned to the supreme court of Hamilton county, from which the subsequent processes issued. If, then, these deeds can be perfected by any after acknowledgment in the Supreme Court, that acknowledgment can only be made in the supreme court of Hamilton county, where the judgment is. The object of the acknowledgment is to give the parties an opportunity to contest the regularity of the sale, and this can not be done unless the judgment, and process upon which it is made, are before the court. It would be absurd and unreasonable to send the parties to any other county to make this investigation. Nothing short of a positive law, authorizing the acknowledgment to be taken in any county, would warrant the court in

receiving it in any other than that where the judgment, execution, and return are of record.

The foundation of the bills in all the cases is, that the complainants each have a legal title. But the court is of opinion that the sheriff's deeds, under which they severally claim, are all defective and inoperative; the bills must therefore be dismissed.

Judge BURNET, having been attorney for McLure, upon whose judgment the lands were sold, did not sit in this cause.

---

*WILLIAM JACKMAN v. J. H. HALLOCK AND OTHERS. [318

*Vendor's Lien—Execution against Lands on Judgment of Justice.*

The assignee of a note given for purchase money of land has no lien.
Equity is not subject to lien of judgment.
Award of execution against land upon a justice's judgment is no lien before levy.

THIS was a bill in chancery to charge certain land with the payment of a balance of the purchase money due upon it. It was adjourned for decision here from Jefferson county, and the facts of the case were these:

The land in question was sold to Vandike by Elliot; part of the purchase money paid, but no deed given. Vandike sold to the defendant Decker, and an arrangement was made, by which Decker gave his notes to Elliot for the balance of purchase money due from Vandike, and Elliot gave to Decker a bond to convey. Two of Decker's notes to Elliot, for the sum of fifty dollars fifty cents each, being the balance of the purchase money of the land, were assigned by Elliot to the complainant Jackman. Upon these notes, Jackman, as assignee, brought suit against Decker before a justice, and recovered judgment. Execution issued and returned no goods.

Jackman then filed a transcript, and obtained a *sci. fa.* from the